**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SOUTHERN OHIO COAL COMPANY,
Petitioner,

v.                                                          No. 95-1000

NATIONAL LABOR RELATIONS BOARD,
Respondent.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                          No. 95-1146

SOUTHERN OHIO COAL COMPANY,
Respondent.

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(6-CA-24742)

Argued: October 30, 1995

Decided: June 5, 1996

Before RUSSELL, WILKINS, and WILLIAMS, Circuit Judges.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Franck Georg Wobst, PORTER, WRIGHT, MORRIS &
ARTHUR, Columbus, Ohio, for Southern Ohio. Vincent J. Falvo, Jr.,

NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Paul J. Spielberg, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This case comes before us on direct appeal from a decision and order of the National Labor Relations Board (the"NLRB"). Southern Ohio Coal Company ("SOCCO") petitions for review of the NLRB's final order that SOCCO violated §§ 8(a)(1) and (5) of the National Labor Relations Act (the "NLRA"), 29 U.S.C.§§ 158(a)(1) and (5),**1** by refusing to furnish District 31 of the United Mine Workers of America**2** with a document relevant to its collective bargaining agree-

_____

**1** Sections 8(a)(1) and (5) of the NLRA state:

> (a) It shall be an unfair labor practice for an employer--
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 157 of this title];
> . . . .
>
> (5) to refuse to bargain collectively with the representative of his employees, subject to the provisions of [section 159(a) of this title].

29 U.S.C. §§ 158(a)(1) and (5).
**2** The employees of SOCCO's Martinka Mine are represented at the worksite by Local 1949 immediately, and District 31 of the International Union.

2

ment. The NLRB has filed a cross-petition for enforcement of its order. Because we are not persuaded that District 31 was the proper entity to request the document or that SOCCO engaged in unfair labor practices by refusing to furnish District 31 with a copy of the document, we remand the case to the NLRB with specific instructions.

I.

SOCCO, a division of the American Electric Power Company, Inc., operates several nonretail bituminous coal mining concerns and related businesses in northern West Virginia and southern Ohio. Since beginning operations in 1974, SOCCO has had a formal collective-bargaining relationship with the United Mine Workers of America (the "International Union"). SOCCO and the International Union are signatories to the National Coal Wage Agreement of 1988 (the "Wage Agreement"). Article I of the Wage Agreement requires the seller of a mining facility to immediately notify the International Union's Secretary-Treasurer by certified mail that the sale has occurred and to provide documentation that the buyer has assumed all rights and obligations of the seller under the Wage Agreement.

In 1992 SOCCO sold its Martinka Coal Mine (the "Martinka Mine"), located in Fairmont, West Virginia, to Martinka Coal Company ("MCC"). Signatories to the Agreement of Purchase and Sale (the "Sale Agreement") include Ohio Power Company ("Ohio Power"), SOCCO, MCC, and Peabody Development Company ("Peabody"). In compliance with the Wage Agreement, SOCCO sent the following letter on July 1, 1992, to the International Union's Secretary-Treasurer:

> This letter is to inform you that [SOCCO] has sold its Martinka Mine to [MCC]. [MCC] has agreed to assume

---

Article 9 of the constitution of the United Mine Workers of America (the "International Union") divides the International Union into several geographic districts. Each district performs several representative functions on behalf of union members. District 31 is a constituent member of the International Union comprising 32 counties in northern and central West Virginia, which includes the Martinka Coal Mine.

3

> [SOCCO's] obligations under the [Wage Agreement].
> Enclosed are the title, 29th, 30th, and 76th pages of the
> Agreement of Purchase and Sale.**3**

SOCCO sent a similar letter with the same enclosures to the president of District 31, although it had no obligation to send the letter and did so as a matter of courtesy. The letter read:

> This letter is to inform [District 31] that[SOCCO] has sold
> its Martinka Mine to [MCC]. [MCC] has agreed to assume
> [SOCCO's] obligations under the [Wage Agreement].
> Enclosed is a copy of a letter along with attachments sent to
> [the International Union] advising [them] of the sale.

The letter also instructed Martinka Mine employees to look to MCC when exercising their panel rights.**4**

_____

**3** The title page read: "Agreement of Purchase and Sale among Southern Ohio Company, Ohio Power Company, and Martinka Coal Company, Peabody Development Company."

Pages 29-30 of the Sale Agreement contain the following paragraph:

> MCC recognizes that the Martinka Mine Operations of SOCCO
> being sold pursuant to this Agreement are covered by the
> National Bituminous Coal Wage Agreement of 1988 ("Wage
> Agreement"), and MCC agrees to assume, from and after the
> Date of Possession, SOCCO's rights and obligations under the
> Wage Agreement with respect to such operations; provided,
> however, that as between SOCCO and MCC, SOCCO shall
> indemnify MCC to the extent of SOCCO's indemnification obli-
> gations contained in Article XIX for claims or losses incurred by
> MCC by reason of MCC's assumptions of the obligations under
> the Wage Agreement.

Page 76 of the Sale Agreement bears the signatures and corporate seals of all parties to the sale.
**4** Under Article II of the Wage Agreement, laid-off employees of signatory employers enjoy preferential hiring rights at other mining facilities owned by their employer. The laid-off employees place their names on the "panel form" at the employers' other facilities, thereby requesting recall to that facility based on their seniority. Therefore, prior to the sale any laid off SOCCO employees of the Martinka Mine gained panel rights at the Martinka Mine as well as at other SOCCO mines in Ohio.

4

> Since [SOCCO] no longer owns the Martinka Mine, any employees who have placed their names on the mine or other company panels should look to [MCC] to exercise their seniority or recall rights. [SOCCO] is no longer the panel custodian nor recognizes any obligation to employees on the mine or other company panels.**5**

Upon receipt of this letter, on July 9, 1992, District 31's vice-president wrote to SOCCO's president, indicating that the sale of the Martinka Mine raised questions about the identity of the buyers and sellers, the obligations assumed by the buyers, and the impact of the transaction on its members. Stressing its obligation to assure its members that their rights under the collective-bargaining agreement were preserved in the sale, District 31 requested that SOCCO provide it with an unexcised copy of the Sale Agreement.**6** SOCCO declined District 31's request because the Sale Agreement contained highly confidential and proprietary information and because it had no obligation under the Wage Agreement to anyone other than the International Union.

In a second letter, dated July 22, 1992, District 31 requested an unexcised copy of the Sale Agreement from SOCCO's Human Resource Manager. In this letter, District 31 refused to accept SOCCO's assurances about the identities of the Mine's buyers and sellers, that the sale conformed to the Wage Agreement, and that SOCCO's contractual obligations passed to MCC under the Sale Agreement. Two days later, District 31 filed unfair labor charges with the NLRB. SOCCO deferred responding to the July request because of the filed complaint.

_____

**5** The evidence of record demonstrates that since the date of the sale, MCC continues to employ Martinka Mine employees under the terms and conditions of the Wage Agreement, and it recognizes the International Union as the employees' representative. MCC also provides those laid-off employees panel rights to approximately twenty mines owned by Peabody.

**6** In this letter, as well as in its letters dated July 22, and September 17, 1992, District 31 offered to sign a reasonable confidentiality agreement regarding the Sale Agreement.

5

On September 9, 1992, District 31 sent SOCCO another request for an unexcised copy of the Sale Agreement. This time District 31 claimed it was entitled to the Sale Agreement because it was pursuing panel rights grievances of employees on layoff status at the time of the sale. District 31 also contended it had a right to review the entire document because companies other than SOCCO and MCC "were involved" and because MCC was too undercapitalized to have acquired the Martinka Mine. On September 17, 1992, SOCCO declined District 31's request, reiterating that District 31 lacked the authority to request such information and that SOCCO had dutifully complied with its obligations under the Wage Agreement to provide notification of the sale to the International Union.

II.

District 31 argues that it seeks the entire Sale Agreement because it believes that the document contains relevant information regarding its duty to protect employees' interests, which may have been affected by the sale. Of particular concern to District 31 are the dispositions of two separate grievances, which were filed prior to the sale and are still pending on behalf of two different classes of SOCCO employees.[7] In addition, District 31 seeks to ascertain which company assumed obligations for medical coverage and disability benefits for the employees either on layoff or disability status at the time of the sale.[8]

District 31 desires an unexcised copy of the entire Sale Agreement because it is concerned about the exact provisions of Article XIX, an apparent indemnification clause referred to on pages 29-39 of the Sale Agreement. In fact, District 31 alleges that Article XIX has been

_____

[7] The first grievance protests SOCCO's decision to not allow Martinka Mine employees the right to panel for employment at SOCCO's Windsor operations. The second grievance protests SOCCO's decision disallowing employees to place their names on panel lists at the Windsor operations, the Central Rebuild Shop, the Cooke Coal Terminal, Central Ohio Company, and Conesville Coal Preparation Plant.

[8] SOCCO has continued to provide medical and disability benefits coverage for all employees who where either on layoff status or who were incapacitated at the time of the sale. To date no disputes regarding either of these benefits has arisen.

6

intentionally concealed by the parties to the sale because its provisions significantly affect District 31's members. Pages 29-30 of the Sale Agreement state (emphasis added):

> MCC recognizes that the Martinka Mine Operations of SOCCO being sold pursuant to this Agreement are covered by the National Bituminous Coal Wage Agreement of 1988 ("Wage Agreement"), and MCC agrees to assume, from and after the Date of Possession, SOCCO's rights and obligations under the Wage Agreement with respect to such operations; provided, however, that as between SOCCO and MCC, <u>SOCCO shall indemnify MCC to the extent of SOCCO's indemnification obligations contained in Article XIX for claims or losses incurred by MCC by reason of MCC's assumptions of the obligations under the Wage Agreement</u>.

Although we understand District 31's concern, we do not believe providing it with the entire Sale Agreement properly disposes of this case, particularly because it is undisputed by the NLRB and by SOCCO that the majority of the Sale Agreement's provisions are irrelevant to the issues District 31 attempts to clarify. Their concession directly contradicts the NLRB's reasoning that the <u>entire</u> document is relevant and necessary to District 31's statutory obligation to represent its members. We do not understand, however, how the NLRB made such a determination without ever having examined the document in question. Thus, we remand the case to the NLRB with the following specific instructions.

First, we instruct the NLRB to confer with the International Union to determine whether the International Union deems the Sale Agreement relevant to its performance of its statutory obligations. Ostensibly, the International Union is the most appropriate organization for the NLRB to confer with on the International Union's need to possess the Sale Agreement because it is the formal entity with whom SOCCO has a statutorily recognized collective-bargaining relationship. Interestingly enough however, the International Union has never sought the Sale Agreement after SOCCO fulfilled its obligation to inform it about the sale under the Wage Agreement. And for reasons unknown, District 31 circumvented the International Union's hierar-

7

chy by never asking the International Union to request the Sale Agreement on its behalf. Should the NLRB and the International Union decide that the Sale Agreement is irrelevant and unnecessary to the International Union fulfilling its statutory duties, District 31 may no longer seek the document. However, should the NLRB and the International Union decide that the Sale Agreement is relevant and necessary to the International Union fulfilling its collective-bargaining obligations, we proceed to our second instruction that the NLRB conduct an in camera inspection of the Sale Agreement.

Although we recognize that in camera inspections are mechanisms of discovery generally conducted by trial courts and not ALJs or the NLRB, we believe, in this particular instance, such an inspection is a more reasonable and equitable approach to determining Article XIX's relevance to District 31's inquiries and whether the International Union, let alone District 31, deserves a copy of, or excised provisions of the Sale Agreement. During the in camera inspection, the NLRB should also carefully review the Sale Agreement for additional provisions that are directly and unquestionably relevant to the issues raised by District 31. Third, and only if the NLRB finds that relevant provisions exist, then pursuant to a strict confidentiality agreement, agreed upon by the parties, the International Union shall receive excised copies of those provisions, which are directly relevant to resolving the specific issues concerning District 31's members.

For the foregoing reasons and with the foregoing instructions, this case is

REVERSED AND REMANDED.

8